**SUNRISE SHOPPING CENTER, Inc., et al v.**
**ALLIED STORES CORPORATION, et al.**
No. C65-3759.
Circuit Court, Broward County.
August 2, 1974.

26

Carl Hiaasen, Fort Lauderdale, for the plaintiffs.

Talbot D'Alemberte of Steel, Hector & Davis, Miami, for the defendants.

OTIS FARRINGTON, Circuit Judge.

*Opinion of the court:* This cause came before the court for trial without a jury and, the court having heard evidence and argument from all parties, it is now prepared to rule and does hereby enter this opinion and final judgment in this cause.

## Parties

The parties to this cause and their relationships to one another are as follows —

*Plaintiffs:*

Sunrise Shopping Center, Inc. — The corporate plaintiff, now owner of the shopping center land on which the store was built, and the lessor, referred to in this opinion as "Sunrise." This firm now seeks to have the lease cancelled.

Charles Creighton — Plaintiff, one of the organizers of Sunrise and its president.

Russell Boyce — Plaintiff, an organizer of Sunrise.

*Defendants:*

Allied Stores Corporation — Referred to herein as "Allied." The parent company of defendants.

Laudermarsh Realty Corporation — A subsidiary of Allied through Alstores Realty Corporation. Laudermarsh was the lessee from Sunrise Shopping Center, Inc.

Alstores Realty Corporation — An Allied subsidiary.

Maas Brothers, Inc. — An Allied subsidiary which was the sublessee from Laudermarsh Realty Corporation.

Jordan Marsh Company — The operating name for the store.

For the sake of simplicity, the activities of Alstores Realty Corporation, Laudermarsh Realty Corporation, Maas Brothers, Inc., and Jordan Marsh will be referred to as "Allied" or the "Allied Group" although a particular activity may have technically been performed by one, but not all, of the entities.

Other persons and firms who were significantly involved in this case are as follows —

Feist & Feist — A New York firm handling the financing and leasing for Sunrise. An agent of Sunrise, but perhaps not the exclusive agent. Mr. Tom Bennett, Mr. Carl Hagerstrom and Mr. Irving Feist are the members of this firm who did most of the work for Sunrise.

C. A. Hiaasen — Attorney, representing Mr. Creighton and Sunrise. Other members of his firm also appear.

Clinton Gamble — Originally the architect for Mr. Hiaasen, later the project architect when Allied built the project.

*Issues involved in this cause*

At the pre-trial conference, the court boiled down the issues to three, as follows —

1. Whether or not the lease should be cancelled as an unconscionable contract and the court set a new bargain for the parties to the lease. (Pre-trial conference transcript pages 12, 28.)

2. Whether or not the note from the plaintiffs to Allied to pay for paving of parking areas should be cancelled because of an alleged misrepresentation. (Pre-trial conference transcript pages 17, 28.)

3. Whether or not Allied is obligated to pay Sunrise the $50,000 that Sunrise paid to Feist & Feist in settlement of suits against Sunrise. (Pre-trial conference transcript pages 13, 28.)

At the trial, a fourth issue was raised, as follows —

4. Whether or not the deductions made by Allied were proper under the lease.

*Findings of fact*

It now appears that there is substantial agreement between the parties as to the facts in this case.

To put this matter into historical perspective, the following analysis will be made, drawn entirely from documents which were agreed for admission into evidence and from the testimony.

In 1955, Mr. Charles Creighton and Mr. Russell Boyce formed the firm of Sunrise Shopping Center, Inc. ("Sunrise") for the purpose of purchasing the shopping center then owned by Antioch College. At the time of this purchase and the negotiations leading thereto, both Mr. Boyce and Mr. Creighton were wealthy men, each having a net worth in excess of one million dollars. Both were competent and in good health and they had each bought and sold real estate as part of their business activities.

The purchase of the center was completed in December of 1955, with Sunrise paying $5,100,000 for the forty-two to forty-four acres and the buildings then existing on the property.

Sunrise and its principals were represented by legal counsel, specifically, Mr. Carl Hiaasen of a prominent Fort Lauderdale law firm, and they have available the services of a CPA and an architect, Mr. Clinton Gamble; throughout all the subsequent negotiations with Allied.

In 1955 there was no major shopping center in the southeast. In fact, shopping centers, which were largely post-World War II

phenomena, had not hit the south. Mr. Creighton testified that Sunrise was one of the first major shopping centers in the southeast United States and there was no other major shopping center in the Fort Lauderdale area.

Significantly, at the time of purchase by Sunrise, the center was *losing money* and Sunrise was the only bidder for the center so far as Mr. Creighton knows.

Sunrise had no specific plans to develop the center, but felt it had growth potential. To develop ideas, Mr. Creighton traveled to other shopping centers, and although he cannot remember all of his travels, he did go to the Framingham, Massachusetts shopping center where a Jordan Marsh store was located.

At some point, Mr. Creighton determined that the center should have a department store yet, in the period following the purchase, department store firms were reluctant to enter shopping centers and it was necessary to do a real selling job to obtain tenants.

Negotiations were opened with Allied. The negotiations with Allied were handled by the firm of Feist & Feist which had been the exclusive agent for the earlier owner and now was one of the agents operating for Sunrise. Throughout the transactions with Allied, Feist & Feist represented Sunrise. The negotiations began at least as early as 1956 and during this *entire negotiation,* Sunrise was represented by the law firm of Carl Hiaasen, which actively participated in the negotiation.

There was considerable negotiation including modifications to various drafts resulting in a first lease between Jordan Marsh and Sunrise which was executed finally on February 20th of 1957.

It is important to pause at this point and make an essential point: this lease, dated February 20, 1957, was the first lease between Sunrise and the Allied Group and it preceded the lease involved in this lawsuit by *32 months.*

Under this agreement, studied by counsel for Sunrise, Sunrise was to build a building of 160,000 square feet (plus penthouse area) and Mr. Creighton, acting for Sunrise, consulted with Clinton Gamble, the architect, about the feasibility of building this building for Jordan Marsh and Allied Stores.

To determine this feasibility, Mr. Creighton obtained cost estimates for the building and obtained a guaranteed price from a contractor, Frank Rooney. The guaranteed price in 1957 was $2½ million for the building itself and Mr. Creighton thought that this was a fair price. Under the 1957 lease, Sunrise was also to give Jordan Marsh one million dollars for fixtures, bringing the total cost to $3,500,000.

Feist & Feist began to look for financing so that Sunrise could construct the building and the lease term could begin, but they ran into some difficulties. In this period, Tom Bennett of Feist & Feist discovered that a relatively recent change in Massachusetts law would allow an insurance company of that state to lend 100% of the cost of construction *and* fixturing to firms with a long history of earnings of four times over debt requirements. Sunrise could not qualify under this law because it had not been in business long enough and because it did not have an acceptable earnings history. Attempts to obtain John Hancock financing would not work unless Allied guaranteed the payments of the mortgage and this was not part of the 1957 lease.

Feist & Feist, the agent for Sunrise, attempted to obtain a guarantee from Allied but it was refused. Sunrise still considered it important for the development of the center to have a department store. (See letter from Sunrise's CPA dated November 20, 1958, which states — "Probably the first new expansion needed is a department store. One national chain agreed to taking a lease, however, lack of equity capital prevented conclusion of the arrangements to build.")

Thus, in the spring of 1959, discussions began about a different type of arrangement. This new arrangement would be one whereby Sunrise would give a ground lease to Allied and Allied would build the department store. (See exhibits in chronological order.)

In April of 1959, Feist & Feist, acting as agent for Sunrise, wrote to Allied and proposed the arrangement under the new Massachusetts lending law. The proposal, contained in the April 17, 1959 letter admitted into evidence, was that there be a loan of $3,500,000 to construct the building and that the procedure be "predicated on the funds of $3,500,000 being *disbursed to and controlled by Allied.*" (Emphasis added.)

Thus, the first concrete suggestion for a change from the existing February 20, 1957 lease, *which Sunrise was not able to perform,* came from the agent of Sunrise.

Mr. Creighton testified that, from April 1959 to the closing of the deal, the arrangement from which *no one deviated* was that the building would be constructed by Allied. From this time forward, all parties moved toward the final arrangement and *nothing further* appears in any of the numerous documents to suggest that Sunrise could or would construct the building.

By May 20, 1959, contact had been made with Mr. John Quincy Adams of John Hancock Mutual Life Insurance Company, and his letter to Allied dated May 20, 1959 outlines the proposed plan.

On May 25, 1959, Mr. Irving Feist reported to Mr. Creighton by letter on the progress. In this letter, Mr. Feist told Mr. Creighton —

> As Tom [Bennett] and I have already advised you, our fee on the placing of the Allied financing will be one and one-half percent and the Allied lease will be subject to a commission of five percent.

On May 27, 1959, Mr. Creighton wrote back to Feist & Feist. He conceded that there had been discussion with Mr. Bennett concerning a commission which Feist & Feist expected *from Sunrise*. These are the words he used on page two of that letter —

> Tom Bennett mentioned to me in New York that you expect 1½% as a finder's fee *on the loan to Allied*. This in the past as you know has been 1% and it still could be made at 1% from half a dozen brokers. *This loan could be resecured any place with Allied credit.* We understand that you want 5% for the Jordan Marsh lease which we also think is too high based on the total volume we expect this store to do . . . (Emphasis added.)

This exchange continued with a May 29, 1959 reply to Creighton from Feist & Feist which again asserted the right to a commission and stated, on page 3 —

> May I, as politely as I can, point out to you that we are the ones responsible for developing Allied's interest and negotiating and re-negotiating over a period of years, until we finally obtained a deal that could be financed, without the investment of equity capital on your part.

Allied did not receive copies of this correspondence of May 25, 27 and 29 and was not privy to the dispute between Sunrise and its agent.

In the meantime, on May 27, 1959, Allied had forwarded to both Mr. Creighton and Mr. Bennett a summary of the proposed deal dated "5/27/59." This memorandum outlined the basic procedure which was to be used. This was, of course, for Allied to receive the loan and construct the building. Mr. Creighton replied to this on June 3, 1959 and agreed with everything except the "parking," which then was discussed further by the parties.

On July 15, 1959, Mr. Bennett sent Mr. Creighton a very important letter with very important enclosures. It stated —

> Following your request and instructions, we have obtained from John Hancock Mutual Life Ins. Co. Boston, Mass., thru their Bond Department, a commitment for a loan of $3,500,000 at 5½% interest, self liquidating in approximately 28 years, 3 months, to finance the cost of construction and fixturing of a department store in the Sunrise Shopping Center in Ft. Lauderdale, Fla.

The terms and conditions are generally set forth in the attached copy of letter dated July 8th, 1959 and two information sheets of John Hancock Mutual Life Ins. Co. dated July 1st, 1959.

We have previously informed you of this commitment by telephone and have arranged for you a meeting to work out the lease details, to be held at 10 A.M. Wednesday, July 15, 1959, in the general offices of Allied Stores Corp., 401 Fifth Ave., New York City. Length and method of payment to be mutually agreed.

In consideration of our arranging this financing, Sunrise Shopping Center, Inc. is to pay Feist & Feist the sum of $52,500 as fee.

It is to be understood that this fee relates directly and only to the arranging of the financing and that any other fees in connection with arranging the leases, etc., are to be handled with Mr. Irving Feist, president of Feist & Feist.

This letter was accepted by Mr. Creighton on behalf of Sunrise on July 23, 1959.

Four critical points should be made about this letter —

First, the letter of July 8th and the memorandum of July 1, 1959 were attached with this letter of July 14, 1959. The terms of the financing was to provide money *to Allied* for the construction of this store.

Second, with full knowledge of the details of the "financing," Sunrise agreed —

"In consideration of our [Feist & Feist] arranging *this financing*, Sunrise Shopping Center, Inc. is to pay Feist & Feist the sum of $52,500 as fee." (Emphasis added.)

Third, the agreement, signed by Mr. Creighton on July 23, 1959, was not the first mention of the $52,500 fee. Examining the correspondence of Feist & Feist and Sunrise, the May 25, 27 and 29, 1959 letters show that Mr. Creighton and Feist & Feist were arguing over whether the fee for arranging the "loan to Allied" (Mr. Creighton's words in May 27th letter) should be 1% or 1½% plus a percentage of the lease. The letter agreement shows that the fee for the "loan to Allied" was a compromise between these two positions, for it was to be 1½% of the $3.5 million $52,500, but no percentage of the lease would be paid.

Fourth, and most important, the arrangement between Feist & Feist and Sunrise was not communicated to Allied at the time. Allied was not consulted and, indeed, Mr. Creighton has testified that the *first time* that he knows that Allied was informed about the disputes between Feist & Feist and Sunrise or the July 15, 1959 letter agreement was on August 10, 1965, *over six years after the*

*fact* and after two lawsuits had been instituted against Sunrise by its former agent and settled.

Thus, Allied continued to deal with Sunrise and its agent, Feist & Feist, without knowledge of the July 15, 1959 letter. Allied did take care to cut off any claim against it by Feist & Feist, however, and on August 20, 1959, Allied received from Feist & Feist a letter which stated —

> This will confirm our understanding that under no circumstances will Allied Stores Corporation, Alstores Realty Corporation or any of their respective subsidiaries be obligated to this company for any commission in connection with any leases entered into by any of them in the Sunrise Shopping Center. . . .

Feist & Feist has never sought any compensation from Allied and it was not the practice of Allied to deal through mortgage brokers since it had its own vice-president for finance.

Meanwhile, the negotiations continued, much of the discussion centering around the parking area and who would be responsible for its paving.

From the time of Mr. Creighton's June 1 letter response to the May 27, 1959 memorandum, Mr. Creighton sought to modify the parking requirement but the parties at no point were able to agree on the modification that Mr. Creighton and his counsel sought. Indeed, Mr. Creighton testified that Allied would *not* agree to pay for the parking area and that Sunrise would have to agree to bear this expense. After discussion with his attorney and architect Mr. Creighton decided to go ahead with the lease.

At this point, the alleged "misrepresentation" should be treated, for Mr. Creighton testified that, during negotiations Allied personnel told him that their opinion of construction cost was that it would take three and one-half million dollars to build the building and there would not be sufficient funds from the loan to pay for the parking.

This "representation" has several interesting aspects. First, Sunrise had planned to build this very building and had made an *independent* investigiation of the cost of construction in 1957. In this investigation it consulted with an architect and with a contractor. It obtained a guaranteed building cost. It intended to build and fixture the building for three and one-half million dollars, the same amount that Allied planned to spend.

Second, the "representation" from Allied was the truth as best known to Allied at that time. Counsel has agreed to admission of the interoffice memoranda of Allied dated July 1, October 22 and October 27, 1959. These demonstrate that Allied was con-

templating an estimated construction cost, without parking, of three and one-half million dollars. The testimony from Mr. Malcolm Beattie, Allied's construction supervisor in 1959 and the exhibits introduced into evidence leave no doubt on this point and the court finds that it was a good faith estimate of the cost prior to construction.

Another detail necessary to the completion of the arrangements contemplated was to secure the agreement of the center's mortgagees. Mr. Creighton went to the mortgagees, Antioch College and Nationwide Insurance Company, and convinced them that they should subordinate their interests to the new loan. In arguing for subordination, Mr. Creighton stated that the shopping center would be enhanced by the addition of a department store, particularly Jordan Marsh with its prestige and marketing ability which would bring more tenants to the center.

He pointed out that security would be heightened with this new construction and the center would have more drawing power. Mr. Creighton concedes that having a major department store like Jordan Marsh helped the center to a bargaining position so that higher rentals could be asked of other tenants and that it is commonly thought that business attracted by major department stores spins off business to other tenants in the center.

Mr. Creighton was successful in selling the mortgagees on these points and there was no consideration given for the subordination agreements except, of course, the agreement of Allied to construct the store, etc.

By late October, all details had been worked out and the parties were ready to close. It is important to note that we are not dealing with a situation where the officers of Sunrise were subjected to great pressure from Allied. Throughout the negotiations, counsel for Sunrise took an active part in negotiations and review of documents. Those documents were supplied at least a week before closing. So far as Sunrise was concerned, the final agreement was done in the most comfortable and leisurely of settings — counsel's Fort Lauderdale office with counsel present.

Mr. Creighton talked with Mr. Hiaasen about whether he should sign the agreement and he had accountants' advice available also.

The final agreement was signed by Sunrise on November 2, 1959, bringing to an end negotiations which had dated back for three years and had included the lease agreement which was executed on February 20, 1957, but which Sunrise was unable to perform.

For some time following the closing, the dispute between Sunrise and Feist & Feist over fees continued. (See correspondence.) Allied was still not made a part of this dispute.

· The dispute dealt with the claim on the Allied deal (see July 15, 1959 letter) *and other claims* by Feist & Feist which dated back into 1957 and continued into 1958. In 1963, Feist & Feist filed a suit based on the July 15, 1959 letter of agreement and in 1965 filed another suit for compensation other than in the Allied deal.

At no time prior to settlement is there any indication that Allied was informed of these suits. Allied was never asked to defend the suits and was given no chance to enter into any settlement. negotiations.

It was almost a month after settlement of both suits was completed (for $50,000) that Allied was first contacted. (See correspondence.)

In 1965, after the settlement with Feist & Feist, the plaintiffs brought this action. In 1966, the department store reached the level of net sales which would support the right to construct an addition under the section of the lease which stated —

> At any time during the term of this lease Tenant shall have the right at its option, at any time after the expiration of any period of twelve (12) consecutive months during which period of twelve (12) consecutive months during which period the net sales (as hereinbefore defined) made in and from the department store located on the demised premises exceed the product of Fifty ($50) Dollars multiplied by the number of square feet of floor space then contained in the department store building, to construct (at the sole expense of Tenant) an addition to said store building consisting of not more than 90,000 square feet of floor space. If an addition as aforesaid is constructed, Tenant agrees with due diligence, subject to delays beyond the reasonable control of Tenant, to fixture and equip same at its own expense with such trade fixtures as are deemed necessary or desirable by Tenant and to make the addition part of the department store business conducted on the demised premises.

At the same time this construction and fixturing of two additional floors was taking place, there were some renovations to the original store. Since, under the lease, the additions could be charged to Sunrise and the alterations to the first three floors could not, it is a matter of importance as to whether these expenditures were properly accounted for and segregated. Mr. O'Hanlon testified that he reviewed the accounting to make certain that it was in compliance with the contract, knowing that this accounting might be questioned in the litigation then pending. Mr. Beattie, the construction supervisor who set up the accounting system and testified as to the importance of that system being accurately maintained, testified that the system was being properly followed at the time of the 1966 construction and fixturing. This testimony was fortified by exhibits which demonstrated that allocations were made between the new construction and fixturing and the renovations to the first three floors.

The plaintiffs have not put on any proof to challenge these figures and this is important because the plaintiff corporation has certain rights and duties under the lease which states —

> Landlord, through its officers, agents, auditors, or attorneys shall have the right within six (6) months after the close of any lease year, at its sole expense, and at times reasonably convenient to Tenant and the department store leases to make or cause to be made an examination of the pertinent books of account and records of Tenant and the department store lessee for the purpose of verifying any statement as is provided for in Section 2 of this Article, provided, however, that *failure of Landlord to take exception to any statement for any lease year within the time set forth above shall be deemed a conclusive acceptance of such statement.* (Emphasis added.) Article II Section 5, page 7 of lease.

Thus, Sunrise has the right to make an independent audit and a duty to accept the figures if it does not follow the procedures agreed to in the lease. In any event, the plaintiff's failure to present any evidence to rebut the clear testimony and exhibits of defendants leads this court to find that the expenditures and therefore the deductions from the percentage of net sales are correct.

## CONCLUSIONS ON THE ISSUES INVOLVED

### 1. *The lease is not an unconscionable contract*

The basis of the plaintiffs' claim on this first issue is that the contract is "unconscionable."

The background of this contract is that the individual plaintiffs, Boyce and Creighton, both millionaires and experienced in real estate transactions, formed a corporation to purchase the shopping center.

They had advice of counsel throughout all transactions with Allied and were represented by a real estate firm (Feist & Feist). A CPA and an architect were available for advice.

What was negotiated between Sunrise and Allied was achieved over a long period of time, 1956 to late 1959, and it was negotiated in an era when there was some business risk in shopping centers.

What Sunrise received was considerable: Allied agreed to build a large department store. Such a store was desired by Sunrise to bring more and better tenants to the center.

Sunrise received ground rent of $5,000 a year and percentage rentals of 2½%. Against this percentage rental, Allied is allowed to deduct certain amounts under the terms of the lease.

Not the least of the consideration is the building itself which, at the end of the lease, will become the property of Sunrise. Mr.

Creighton admits that the building is more valuable today than when it was constructed.

This is not a case where either party was uninformed or acting under duress. This was a bargain hammered out by experienced businessmen with ample resources, each participant having the benefit of expert advice. Allied insisted on a hard bargain. Mr. Creighton acting for Sunrise agreed to the hard bargain against the advice of his able attorney in order to gain the advantage of having a large department store locate in the shopping center. Plaintiffs accepted the hard bargain insisted on by Allied by considered judgment; they will not now be heard to object that the transaction was unconscionable.

2. *The note from the plaintiffs to Allied to pay for paving of parking areas should be paid because it was the duty of Sunrise to pay for paving of the parking area*

The lease calls for Sunrise to provide the paved parking, Article VII, Sections 1 and 2. It states —

Section 1. Landlord [Sunrise] agrees . . . (a) to complete as *paved parking* areas the areas of the Shopping Center lying in Tract B of the Plat shown on the survey attached hereto as Schedule C except such areas . . . [where buildings are to be located] . . . and (b) to complete construction on Tracts A, C, D and E and lots 1, 2, 3, 4 and 5 of Block 1 and lot 1 of Block 5 of the Plat of *paved parking areas* . . . and (c) to *complete construction* in the Shopping Center of *parking area entrances and means of access, passage and egress in accordance with a plan heretofore submitted by Landlord to and approved by Tenant* . . .

Section 2. Landlord agrees that at all times it will *maintain as parking areas* designated as parking areas in clause (a) of Section 1 of this Article VII . . . Landlord further agrees . . . it will provide and maintain, in areas other than Tract B of the Plat, *convenient automobile parking areas* for a number of automobiles which when added to the number provided for in the parking areas referred to in the preceding sentence is not less than the greater of (a) 3,000 automobiles or (b) such number of automobiles as is represented by the product of 7.5 multiplied by the number of thousands of square feet of floor space in the Shopping Center, provided, however, that the parking areas located on areas of the Shopping Center other than Tract B of the Plat shall at all times be adequate for the convenient parking of at least that number of automobiles which is required for the Shopping Center by clauses (a) and (b) of this Section 2, less 1,852 . . . . *Landlord, at its expense,* shall at *all times ensure that all of the parking facilities referred to in Section 2 of this Article and all of the means of access, passage and egress referred to in Section 3 shall be adequately paved and drained and maintained in good order, condition and repair* . . . (Emphasis added.)

The money to meet this obligation came from Allied and Sunrise executed a note for the amount. Sunrise now takes the position

that it should be relieved of the obligation because there was a "misrepresentation."

What is this misrepresentation? It is that, in 1959, prior to building the department store, Allied estimated that it would cost $3.5 million (the amount of the loan from John Hancock) to build the store and that Allied was unwilling to pay for the paving.

The elements of a misrepresentation sufficient to justify cancellation of the lease (or the note) may be found in any number of Florida cases and are almost hornbook law. See 5 Fla. Jur., *Contracts,* §21. There are at least three such elements and they can be simply listed and negatived as follows —

(1) Representation must be made by one contracting party to another.

*Facts:* In this case, the first mention of the cost of construction came from Sunrise to Allied in the form of the April 19, 1959 letter from Feist & Feist. Thus, it is Sunrise, *not Allied,* that first introduced the figure.

(2) Representation must constitute an inducement to the agreement.

*Facts:* Allied never lured Sunrise into the agreement with any representation. Allied took the unvarnished and unaltered position that Sunrise should pay for paving the parking area and never deviated from that position. Sunrise was never misled into thinking that Allied would pay for the parking because Allied from the first stood firm on this point.

(3) The representation must be one that the complaintant is justified in relying on and does rely on.

*Facts:* In this case, the plaintiffs had even greater access to knowledge about building costs in Florida than did Allied. Sunrise was to build the store under the 1957 lease and its officers had consulted with architects and contractors to determine the price. The plaintiffs were not justifed in relying on a representation even if one had been made. Thus, one who has made an independent examination is not entitled to rely on a representation. As the Florida Supreme Court said in Harris v. Zeuch, 103 Fla. 462, 137 So. 135 (1931), quoting from an earlier Florida case —

"While it is true that one cannot by a fake representation induce carelessness upon another's part in the matter of signing papers and then profit by such negligence, *the policy of the law is that he who will not reasonably guard his own interest when he has a reasonable opportunity to do so and there is no circumstance reasonably calculated to deter him from improving such opportunity, must take the consequences.*" 137 So. at 138 (Emphasis added.)

Of course, all these elements assume that the representation has been false. In fact, the representation made in this case was *true*. The representation was that Allied's estimate of construction cost was $3.5 million. This *was* Allied's estimate. (See the SP-11 form admitted into evidence.)

Moreover, this estimate was made *before closing* and at a time when no one really knew what the actual construction cost would be. Mr. Creighton testified that he would not expect anyone to determine in advance what the precise cost would be and that it would be hard for a sensible businessman to guarantee a specific cost a year before the project was completed.

Further, Mr. Creighton agreed that the so-called misrepresentation in 1959 was *exactly* what he had thought it would be back in 1957 after his independent investigation.

There has been no misrepresentation and, under the bargain between the parties, Sunrise must pay its obligation.

### 3. Allied is not obligated to Sunrise for the amount of its settlement with Feist & Feist

Feist & Feist and Sunrise had a relationship of agent and principal. Sunrise had Feist & Feist negotiate with many other tenants (DePinna, Saks, etc.) for both leases and financing arrangements.

Sunrise and Feist & Feist had a running argument about fees and commissions dating back into 1957 and this dispute lasted during the Allied/Sunrise negotiations and well beyond.

Allied was not a party to these disputes nor this relationship and was never informed of the dispute until after they were resolved by settlement of the two lawsuits.

Allied was never asked to pay a fee, never given a chance to defend the suit, never given an opportunity to discuss potential liability nor discuss the amount of the settlement.

Of course, Feist & Feist had agreed, in a letter to Allied, that it was not seeking a commission on the lease. This statement by Feist & Feist is natural enough: Feist & Feist did not represent Allied. Further, as Mr. Murphy testified, during this era Allied *never* used mortgage brokers to obtain its financing for it had its own vice-president for finance.

Feist & Feist did, however, act as agent for Sunrise as Mr. Creighton repeatedly testified. As an agent for Sunrise, Feist & Feist had contacted Allied, worked out the February 20, 1957 lease,

explored possible financing for Sunrise and obtained it, according to Creighton. When that financing would not work, Feist & Feist proposed a new arrangement, went to Boston to help put it together and went with Mr. Creighton to Ohio to help obtain the subordination agreements.

By July of 1959, the new proposal was well worked out and Feist & Feist sent Sunrise a memorandum and a letter fully explaining the transaction under which Allied would receive the money and with those documents sent a cover letter which was acknowledged by Mr. Creighton in his capacity as president of Sunrise on July 23, 1959. It said —

> "In consideration of our [Feist & Feist] arranging this financing, Sunrise Shopping Center, Inc. is to pay Feist & Feist the sum of $52,500 as fee."

Allied did not authorize that agreement and did not even know of it until almost six years later.

There is no basis for holding the defendants liable for the $50,000 paid by Sunrise to Feist & Feist.

### 4. The deductions against percentage rent payments have been entirely proper

All evidence in this case shows that the deductions were proper. The defendants took care to properly segregate expenditures for the 1966 construction and there is no proof of any improper expenditures or accounting practices. No other deduction was even called into question.

*Final judgment:* It being the judgment of the court that the plaintiffs have failed to prove their cases by a preponderance of the evidence and that the manifest weight of the evidence is for the defendants as set forth more fully in the separate opinion of the court filed herein, it is ordered and adjudged that judgment be entered against the plaintiffs, Sunrise Shopping Center, Inc., Charles Creighton and Russell Boyce, who shall take nothing from this action, and the defendants may go hence without day from the claims of the plaintiffs.

It is further ordered and adjudged that judgment should be entered for the counterclaimant on the counterclaim by Allied Stores Corporation against Sunrise Shopping Center, Inc., Charles Creighton and Russell Boyce jointly and severally to pay $77,369, plus interest, from the date of this judgment.